The case of the morning is number 14-30067, Ball v. LeBlanc. We'll hear from Mr. Guillaume. May it please the court, Grant Guyot here, representing the state of Louisiana, through the Department of Public Safety and Corrections. James LeBlanc, Secretary of the Department, Warden Burl Kane, and Death Row Warden Angelia Norwood. Your Honors, the primary reason we're here today is to determine whether this court's binding precedent in Gates v. Cook is still viable, or if, as the district court judge would state, whether or not it is no longer controlling authority. I'm not sure I understood you, Counselor. You're asking whether Gates is controlling? No, sir. We are arguing, I think at issue today is the continued viability and applicability of Gates v. Cook. Well, that's all right. That was a Mississippi prison. And the law, I think, is Supreme Court law. I'm interested how the plan that you submitted after the order of the judge, how it compared with what you said you were doing. The Gates procedure in Angola. And then you submitted a plan, which I don't have. Maybe it's in the record, but it wasn't in the record. Mississippi, Your Honor. As big as the excerpts were, it wasn't in the record. How did it compare? Your plan to satisfy the judge's order, how did that compare besides the two degrees of temperature? Well, Your Honor. And forget the individual liability. But for the state and the prison temperature, how did what you had to do under the plan compare with Gates, what they had to do? Your Honor. Except the two degrees. What else? Well, the judge's order and what we put in our proposed remediation plan required us to maintain a heat index of 88 degrees or below. I understand that. I want to know if all we're arguing about is two degrees of temperature. That's what I want to know. No, sir. I believe we're arguing about mechanical cooling, which for all intents and purposes is the only practical way to achieve the benchmark heat index proposed. All right. Your Honors, I think an important issue here is the district court, and I quote, determined that its judgment is appropriate based on our nation's current standards of decency. We believe the district court erred and did not consider the extreme burden that must be met when determining whether or not society's notions of decency have evolved. And the place we get guidance from regarding these guidelines is this court's decision in Wilson v. Lionel. It's a 1989 decision out of this court, and we cite it in our brief. This court says that in order to determine whether society's standards of decency have evolved for the purposes of an Eighth Amendment claim, one must consider whether there's been a change in the binding case law suggesting an evolution of standards or whether society is in agreement regarding the current standards of decency. Counsel, it appears to me that the opposing counsel only argues evolving standards of decency in a footnote in the brief, so that does not appear to be the basis of opposing counsel's argument. I think they're arguing that under Gates that they prevail. So can you address this under Gates and why this isn't required under Gates, please? Absolutely, Judge Elrod, and I should add there's two components to this case. One is did the defendants, my clients, meet the Gates standards as you're asking about, and the other is is Gates enough, which is what I was just addressing with the standards of decency. Did my clients meet Gates? Well, we think the record is clear that we did meet the standards in Gates. Gates prescribes three specific remedies, and I must note that in that case the doctor who examined the health of the inmate in the records was Dr. Susie Visallo, and she's the same doctor who is plaintiff's expert in this case who also took a look at our plaintiff's medical records. So I would just like to give you all that background. The remedial measures at issue in Gates that the court said you needed to implement through the months of I believe it was May through September or April through September, but there are three specific remedial measures that we implement. The first one is fans. Now, plaintiffs may suggest that because we don't have individual fans in each cell that that prong is not met. However, I would argue each fan is shared among two inmates. So two inmates share a 32-inch fan that is positioned between them straight ahead, and the air is blowing. And contrary to the plaintiff's argument, there are statements in the record that suggest the inmates do receive adequate remedies from this fan. When asked if they provide relief, one plaintiff, Nathaniel Coates, said they help. They help. And that's page 5687 of the record. Another inmate said he requests that the fans be turned off when he's shaving. Now, I understand, I guess, when you're shaving, the air can interfere with the shaving cream on your face. But if the conditions are so severe, so swelteringly hot, it would seem to me you wouldn't request that the fans be turned off. And that page number is 5772. If we were to order that the temperature index at Angola's death row, a facility built less than 10 years ago, has to be lowered to 88 degrees, wouldn't that apply to just about every prison in the Fifth Circuit? Across three states. Mississippi, Texas, and Louisiana. And it's not just the state prisons. You also have to look at the county prisons, the smaller prisons. It would be a large burden on the prisons to have to set forth the cause to implement these measures. Did anybody happen to bring up at trial what percentage of the population of Louisiana lives without air conditioning? That, I'm not sure of the exact number, but that was proposed at the trial of this matter. And the judge's response was those who live in Louisiana without air conditioning have the ability to get on a bus or to walk somewhere that does have air conditioning while these inmates do not. That was the judge's response. But we did, the defendants did, set forth that argument. Where does the 88 degrees come from? That's a very good question, Judge Elrod. Judge Susie Visalo set forth that number based on her studies. However, we could not find with any clarity why that is the magic number. Her studies? Her studies, yes ma'am. She relied on certain studies. She specializes in what's called thermoregulation. It's the ability of the body to respond to heat in a way to remedy the heat. The court didn't come up with that based upon its view of the expected materials that are at issue. This was based upon the expert's testimony. Largely. Or what would be the right amount? Largely, yes ma'am. So what is it that you believe the court did incorrectly in relying upon taking judicial notice of certain items? If it comes to the expert's main point, is there any moment that the district court also took judicial notice of certain things? I don't think we objected to the basis of them taking judicial notice and relying, in fact, on the expert's testimony because that was offered at trial and we had the right to cross-examine. I'm asking if there's something else that was relied upon. It appears to be an argument in the brief, but is there any significance? I would say it's not the primary issue, but it's certainly – our expert, in particular our meteorologist, did not have the chance to cross-examine this data. I think the biggest – You mean the data that the court brought back? You don't mean the data of the expert? No, ma'am, and I should state that before the trial happened, the court ordered an independent monitoring agency to collect heat index and temperature numbers, and those we certainly had the chance to review. What I'm referring to are certain websites and airport temperatures that the judge brought up through his opinion. But that's not the basis for the ADA freeze. No, ma'am. It may not be. It was just a point we wanted to note that the judge specifically at trial said he was not going to rely. I'm sorry. Go ahead, Judge Jones. We're bound by the PLRA, are we not? Prison Litigation Reform Act, yes, ma'am. Which specifies the most narrow practicable remedy, right? Yes, ma'am. You have to be as narrow as possible. And didn't Dr. Vasallo in her recommendation suggest the use of ice water, showers, fans if air conditioning was not provided? Yes, ma'am, and in fact, like I said, Dr. Vasallo actually played a part in gates. She played a similar role in gates, and the way the court adopted the district court's recommendations based on her recommendations, ice water, fans, light clothing, although that wasn't a specific remedy listed in gates, we implemented it. We actually, I would say, Your Honors, implement these measures all year long, not just during the hottest months, and we provide additional remedial measures that are not required by this court in gates, including light clothing. The inmates are not required to engage in manual labor. They do have access to medical care if there's an emergency. 24-7, there is a way to tend to their medical emergencies should they have one. So, I'm sorry, go ahead, Judge. I know this goes to the facts, but did anyone cross-examine Dr. Vasallo about the human body's ability to adjust to different climates? In other words, people who live in the north have a lot higher tolerance for heat than we in the south do. And likewise, they have a lower tolerance for—sorry, higher tolerance for— I was about to say I'm not sure which south. Higher tolerance for cold, lower tolerance for heat, and vice versa. Yes, and I do believe she was cross-examined on that. I do know there was testimony to that effect at trial. All three inmates grew up in Louisiana, and while they certainly don't have the choice of where they reside now, they did grow up in Louisiana. Well, but they've lived on death row. Every one of them has been on death row for at least six years. One of them has been on death row 15, one of them 22 years, right? Correct, and this building was erected in 2006. Why was it erected? Pursuant to a court decree? That I'm actually not certain of, Your Honor. What I do know is that the defendants took into account the Gates factors when they constructed the building. And isn't it essentially the same configuration as the death row that was at issue in the Chandler case? That's absolutely right. Yes, ma'am, it is. And the court, you'll recall, found that there was no need to implement additional remedial measures in that case. They found there was not an Eighth Amendment violation. Did the court make a specific finding that the Gates remedies are not available in this case because of the ice, water, showers, and that sort of thing? Because the water is lukewarm? And if so, would we have to find that clearly erroneous? What do you seek us to do about that? That would be a factual finding that would be reviewed under its clearly erroneous standard, Your Honor. Is it clearly erroneous? I believe it is, and I would like to, if you don't mind, set forth a few examples of the testimony offered by the plaintiffs themselves, the inmates, that contradict the court's findings. All three plaintiffs admitted they had unlimited access to water via the hot and cold faucets. One plaintiff said the water from the cold faucet was significantly cooler than the water from the hot faucet. Another inmate in his deposition testified there is nothing that can be done to improve the quality or the amount of water provided to the inmates. Another inmate also, and I have record numbers if Your Honors would like this. Another inmate also, when he was asked about the difference between the water temperatures from the faucets, he said the cold water is normal and the hot water is normal, indicating that there was a difference. But is there evidence in the record that supports the district court's determination to do the contrary? He personally went and visited the prison, and he put in his testimony, in his opinion, that when he felt the water faucet, it was lukewarm to the touch. You know, I don't – I just frankly don't understand that because my water faucet at every house I've ever lived in runs warm in the summer because the ground is hot, pipes get hot, therefore the water is hardly ice. Today, on the other hand, it was quite chilly. Well, just another example I would like to set forth. That's a finding that I just really don't quite comprehend, but the rest of it about fans and ice and so on. And I actually do have – and I provide examples where they said the fans were sufficient. Regarding the showers, gates require a daily shower. We provide that to them should they wish to do that. There was a complaint somewhere in the record stating that the water temperature was too high. But I also would like the court to note that in the judge's opinion, he conceded that the parties agreed there are certain standards of the water temperature. It has to meet for hygienic purposes. What do you wish us to do? I wish for the court to reverse the district court's finding that there was an Eighth Amendment violation, especially in light of the fact that we not only meet but exceed the remedies set forth in Gates. And I ask for the court to affirm that portion of the district court's judgment that found there was no violation of the ADA, the Rehabilitation Act, or the ADAAA. All right, Your Honor, I believe that's the time for my – That is. Thank you for timing it well. Thank you, Your Honor. We have time for rebuttal. Ms. Vera Bora. Mr. Bora.  No problem, Your Honor. Good afternoon. Sorry, good morning, Your Honors. And may it please the court, my name is Nile Bora, and I represent plaintiffs, appellees, cross appellants, Mr. LZ Ball, Mr. Nathaniel Code, and Mr. James McGee. In 2007, Louisiana's Department of Corrections moved plaintiffs into a state-of-the-art facility, which is unique amongst prisons in Louisiana. It is unique because plaintiffs are not only denied air conditioning, but also the architectural features of a facility that are normally found throughout Louisiana that would mitigate the extreme summer heat. May I ask you a question? Certainly, Your Honor. Does the lack of AC – is the lack of AC on death row unique to Louisiana prisons? Your Honor, it's the totality of the circumstances that this court must examine with respect to the conditions of confinement. And yes, in that respect, Your Honor, it is unique in that the other prison facilities contain architectural features that make it such that the lack of AC would not be as large of an issue. Here, the prison specifically has and has been designed to have AC in all areas. It was called for in the original architectural plans. However, the prison made a policy decision not to include AC in those areas where my clients, Mr. Ball, Mr. Code, and Mr. McGee, are housed and required to remain in their cells for 23 hours per day. Well, how about maximum security prisoners? How do their – I'm just asking how do their facilities differ? Your Honor, there is no evidence in the record on that issue, and I don't have any personal knowledge as to how they would differ. What I can tell the court is that with respect to this particular facility, the architectural features result, according to the person who designed, the mechanical engineer who was responsible for the design of this prison, they result in trapping the heat during the course of the summer day and then slowly dissipating that heat at night, which is the reason that the court, during its independent monitoring, the data showed that the heat index inside of the prison was up to 20 degrees hotter than it was outside, and it was otherwise the same conditions as it was outside of the prison. For that reason, Your Honor, the architectural features result in a condition of confinement that is unconstitutional in this case. Counsel, you're not contending that the top of the tiers where the death sentence inmates are kept has to have air conditioning. It is different that below that they have air conditioning. You're not standing here insisting they've got to have air conditioning. Now, I understood from what I read in this record or the trial court's opinion that there's a problem of air circulation, which would make a difference in the temperature, and if that, if there were more circulation, there probably and could be adequate 88 temperature or lower. Is that right? Generally, yes, Your Honor. Plaintiff's position is not that air conditioning is required. Plaintiff's position is that the Eighth Amendment requires a minimal level of safety to be achieved. In that sense, then, Your Honor, the expert recommendation, which the district court adopted, provides that an 88 degree heat index should be adopted. The means for this were left to the prison. I come back to the plan. Was anything done in the plan that was offered in March that would have improved the circulation through the three tiers of these plaintiffs? Your Honor, the defendants, as far as I understand it, did not include any additional circulation in their plan. The plan for the court's benefit, as Judge Jones asked for record citations, is contained at Record on Appeal 5393 to 5421. That specific plan was designed to use the existing ductwork and the existing facilities in which the cap was established of a maximum heat index of 88 degrees. The prison was provided the full opportunity for self-determination with deference to the security concerns to be able to achieve the necessary level for safety. Consistent with Brown v. Plata Supreme Court in 2011, 2012, and consistent also with this own court's precedence in Williams v. Edwards, the prison was provided an opportunity for self-determination after the district court adopted an expert's recommendation as to what was necessary. I keep coming back to the plan because that's what they're willing to do. What was done about air circulation in their plan? Your Honor, with respect to air circulation in particular, I don't believe that there was necessarily anything done directly. However, the issue was how do we achieve an 88-degree maximum heat index? The method that the prison chose and that the defendants chose was to install mechanical cooling, and that was a decision that they made given the full opportunity over the course of over two months. Well, now, wait a minute. Install mechanical cooling? How will that help? Well, that's AC. Yes, that's correct, Your Honor. So the prison chose to install mechanical cooling to achieve that goal? That's correct, Your Honor. I'm sorry. Did they choose or did they not choose that as the method to accomplish the 88? The prison chose AC as the method of achieving the 88-degree heat index. This is the same situation that occurred in Jones L v. Burge in the Seventh Circuit. This is the same situation in Graves v. You're getting off on procedural because they didn't choose AC. They had to comply with the court's order that 88 degrees was the heat index, right? That is correct, Your Honor. They had to comply with that order. And the only way to do that short of providing somebody to flap something up and down in front of each prisoner was to go for AC? Your Honor. Is that not right? Your Honor, I have no method of knowing whether that's right or not. Well, who said it was the only practical way? Does the record reflect one way or the other whether or not that is the only way to achieve the 88 degrees? Does the record reflect one way or the other on that question? Your Honor, according to the testimony of defendant's expert, Henry Eery, which I believe, if you'll provide me with the moment, I'll provide you with the citation to that. I believe it's at Record on Appeal 5076 to 5085. And then at 5099 to 5106. And then finally, at 6308 to 6309 and 6312 to 6315. Mr. Eery specifically testifies that there's more than one way to skin a cat. There are multiple methods of achieving the 88 degree heat index that plaintiff's expert recommended. And therefore, this was defendant's own expert who said that there are multiple ways to achieve this. Given the PLRA's requirements that the means to achieve the necessary end be narrow and non-intrusive, the defendants were provided with the opportunity to make it as narrow and as non-intrusive as they desired once the necessary level of a heat index was established for purposes of safety. But if this is a matter of the defendant's choice, and they might not have, one might allege that they hadn't been aggrieved by the court's decision because they got to choose. Now obviously that's not the case because we have an appeal before us. What do you say about the fact that, you know, how do you reconcile the district court's ruling, two questions, ruling with Gates versus Cook, which only required, only, but definitely required, fans, showers, daily, and the availability device, number one. And number two, how do you, I forget, so let's try that one first. Certainly, Your Honor. First of all, I want to point the court to the district court's opinion, which says that the Gates versus Cook remedies are not provided on Angola's death row. Second, with respect to Gates versus Cook, the procedural posture is important to be kept in mind, as well as the controlling precedent of this court in cases such as Alberti and Gates itself, as well as the Supreme Court's own precedent in Rhodes versus Chapman, that there is no minimal set of standards that can apply. Well, excuse me, but the expert here, Dr. Fasalo, was giving very specific testimony about the effect of extreme heat on prisoners with certain compromised medical conditions. Was she not?  And the guards have to presumably don't have those conditions, and the healthy inmates don't have those conditions, so how can you extrapolate from the fact that three inmates who have hypertension, diabetes, and obesity, and mental problems, and are taking medications, have to have an 88 degree index, whereas the dozens of other prisoners on death row don't have those conditions? Respectfully, Your Honor, I believe that Dr. Fasalo's testimony was a little bit different, as well as her expert report was a little bit different in terms of what it stated. If you look at the expert report, which is admitted into the evidence, at Trial Exhibit 99, you will see that Dr. Fasalo states that the general population reaches a risk level at above 88 degrees heat index, and therefore, in addition to establishing a maximum 88 degree heat index level, there is a suggestion that cold drinking water, that fans, and that cold showers be provided to my clients. That did not occur with respect to the remedies that Gates suggested. And so the issue, if I may just address the medical conditions, Your Honor. With respect to the medical conditions, that actually goes to a question that Your Honors had directed to my opposing counsel here, which was that the medications and the specific medical conditions do, in fact, hurt the ability of the body to acclimatize, which means to get used to the types of temperatures that they are being exposed to. Because of this, and because of their underlying medical conditions, they are, in fact, at greater risk than the general population, which is already at risk, according to Dr. Fasalo's report. But if the guards have to work in the same conditions as the inmates, then – and I realize we have an amicus brief from Texas prison guards, but surely OSHA would have said that nobody can ever be forced to work in an environment with a heat index of 88 degrees. And, of course, if that were so, the U.S. Army couldn't have functioned in Iraq or out on the desert or in El Paso where they live in tents. So I don't quite understand the extrapolation. There just seems to me to be a logical disconnect between what the body – what may subject the body to risk at 88 degrees and what can be done to ameliorate the risk. If I may address that, Your Honor, when the United States Army is in Iraq, they are not confined to cells for 23 hours per day. They have access to drinking water. They have access to air-conditioned facilities. They have – Not when they're fighting in Fallujah, and I was in the green zone, and the grunts, the people who were the ordinary soldiers, said they were fortunate to go back to where it was 100 degrees during the summer.  The totality of the – I don't mean to develop a red herring, but all I'm saying is how do you explain the extrapolation from 88 degrees heat, which is dangerous allegedly for everybody, to the – I suppose to simply those who have compromised conditions? I'm sorry, Your Honor. I'm not sure I understood your question. The judge could have simply ordered that these three plaintiffs be put in special cells or be put in the cells that are right next to where the door swings open to the pod and they get air conditioning, couldn't he? Your Honor, the reason that the court provided for system-wide relief was because the inmates, as is contained in the record, are moved around, and the prison wants to have the ability to move the inmates, my clients, Mr. Ball, Mr. Cote, and Mr. McGee, to any cell on any tier at any time. For that reason, if they want to have the freedom to do that, it is necessary that an 88-degree maximum heat index be achieved throughout the facility where they are going to be incarcerated. Again, pursuant to the prison's policies, providing only one hour outside of their cell in which they can access ice, in which they can access cold drinking water, and other remedial measures. Well, the fact is they're not out of access to ice. The fact is that they're dependent on others to get the ice in the ice chest, right? So when they go out, and this is from the court's own findings, that each inmate has limited recreation, but he can go out in the hallway for an hour each day. So if you assume there are 10 or 15 inmates on each row, then that means 10 hours a day when someone is out there with access to the ice, and the inmates are dependent on the other inmates to get them ice at other times. Isn't that correct? That is correct, Your Honor, but I don't believe that tells the entire story because the inmates themselves cannot rely upon inmates who have unsanitary hygienic practices or who otherwise have communicable diseases. I understand it's not perfect. I also think, I'm just reciting the record, that they, lest there be misunderstanding that they can never have ice because, in fact, except at night when the pod is locked down, someone is always out in that hallway. Your Honor, I don't believe that someone is always out in the hallway. I don't believe that's contained in the record. Second, with respect to that issue. Well, I mean, go ahead, excuse me. I didn't mean to interrupt, Your Honor. That's okay. Does the record also say, though, that the ice runs out in the main location and you get the ice and that there's not really ice in the cooler all the time that anyone can go and get? I'm getting this record and it's going to be another case later. I thought this record said that actually there's not really ice to get out of the cooler. That is correct, Your Honor, and also that was a significant factor as well in Dr. Vassallo's recommendation with respect to a maximum heat index because in order to treat somebody for the emergency that is heat-related illness or a heat stroke, you would need to dump 100 pounds of ice upon the person. You would have to pack them in like a sardine, and that ability to do that is nonexistent at the current facilities according to Dr. Vassallo's inspection and all the other evidence contained in the record. I want to just be clear. The record is that sometimes you can go and get ice from the cooler when you can go in the hall and get it, but sometimes there's no ice in the cooler and there's no ice even in the main ice machine to get there because they're constantly running out a lot. Is that correct? Yes, as well as the fact that occasionally the ice machine, the main ice machine, if you will, Your Honor, because the other ones are ice chests, igloos, the main ice machine does break. I know that's in your record, but is that in the findings of the court? Is what, Your Honor? Your assertion is that the availability of ice is episodic, but is that clearly in the findings of the court? I don't think so. I would have to ask the court's indulgence to provide that after the end of my oral argument. We can read the record.  But the finding, I apologize, Judge O'Rourke. I just wanted to point, if I may, Your Honor, I just wanted to point out that the specific factual finding which this court must review for clear error is that my clients do not have direct access to ice and that the ice does, in fact, run out. But I am not certain about whether the ice machine breaking is part of the district court-specific factual findings. I wanted to turn your attention to another area. Opposing counsel began his argument by saying that what you're asking for is to not follow Gates and to extend the law. I know you had an argument for that in a footnote, but in order for you to win today, do we have to not follow Gates and extend the law? Are you asking us to do that? No, Your Honor. I'm not asking you to abrogate Gates. The reason that Gates cannot provide that type of precedent is because the Supreme Court has stated that there is no static test and no minimal set of standards that can be named sufficient to satisfy the Eighth Amendment. Second, Your Honor, on that issue, if I may, the risk to this court with respect to opening up floodgates and requiring air conditioning does not, in fact, rise to the level that my opposing counsel stated. If you look at the record, the citations that we provided with respect to the facilities that are within this court's jurisdiction, Texas County Correctional Facilities, maximum to minimum, have an 85 degree maximum. Louisiana Juvenile Facilities require air conditioning. And then during the course of preparation for this oral argument, it was made clear during a Baton Rouge Advocate article of August 2013, the Mississippi Department of Correction spokesperson stated that there is a maximum heat index of 85 degrees on Mississippi's death row. These are three facilities in each of the states that this court covers that have some sort of limit like this already. But even if that was not the case, Your Honor, the controlling case law of this circuit in Alberti v. Clevenhagen, in Williams v. Edwards, in Gates v. Cook, in Gates v. Collier, and in Smith v. Sullivan states that the totality of the circumstances must be determinative on the injunctive relief. But you're going back to cases that were decided on the basis of multiple conditions with temperature control being one of dozens of conditions. Your Honor, under Farmer v. I agree with you on totality, but we are not talking about totality. We are talking about a specific risk here. Your Honor, in Farmer v. Brennan, the Supreme Court makes clear that the deprivation of a single human need as a result of the totality of the circumstances is sufficient to violate the Eighth Amendment, and therefore my client's position, Mr. Ball, Mr. Code, and Mr. McGee's position is that in this situation, under Farmer v. Brennan, there is a requirement for safe shelter that is not being met. We know the Hornbook Law. Let me ask you one final question, unless my colleagues have also final questions. You say that we may distinguish this from Gates v. Cook, where the temperature was routinely in the 90s in the death row of Parchman on the basis that every case has to stand on its own facts. But, in fact, Dr. Casalo was not talking about a fact that could vary from case to case. She was making a categorical opinion that temperature indices above 88 degrees are dangerous for the human being. Now, if that is a scientific fact and she was testifying, unconstitutional conditions in Parchman, how can it be that a few years later we have unconstitutional conditions when we do not fulfill that condition in the particular way that was allowed when we have to go beyond what Gates v. Cook endorsed? My time is out, Your Honor. I'm asking you. Of course, you answer the question. That's all I was asking for, Your Honor. It's time to answer. There's a lot packed into your question, so I just want to try to make four points. The first is that the scientific evidence that exists in this case, if you look at Dr. Casalo's expert report, which was admitted at Trial Exhibit No. 99 on page 8, she provides a list of publications, which includes an appendix that contains all the publications. 88 degrees. I'm assuming that argument. I'm sorry, Your Honor. I didn't mean to interrupt you, but what I was trying to get to was the Gates issue a few years later, which you had addressed. The point is that there are 13 publications that Dr. Casalo cites that post-date the February 2003 trial date of Gates and that provide new scientific and medical knowledge. This leads me to my second point, Your Honor, which is that when scientific and medical advances occur, the federal courts are directed to include and incorporate that information into their determination on conditions of confinement cases. This is the law according to Helling v. McKinney and as well as the case that my opposing counsel cited from this court in 1989, Wilson v. Linbaugh, with respect to environmental tobacco smoke. In Wilson v. Linbaugh, this court stated that there was not a consensus on the issue of environmental tobacco smoke and the health risk posed. In Helling v. McKinney, just three years later, Your Honor. Just three years later. Just three years later. You could put that more as we got overruled. I didn't want to use those words here, Your Honor. The third point, Your Honor, is that with respect to the procedural posture of Gates, it's important to note that this court was merely reviewing for abuse of discretion an injunction that was ordered by the magistrate judge after a trial. In that sense then, Your Honor, the plaintiffs had only asked for fans, ice, water. In this case, the plaintiffs asked for something more and when the plaintiffs asked for something more in their grievance procedures, the defendants responded and cited to a public health guideline from 2006, again which postdates Gates, which the defendants relied upon themselves, which states that fans are insufficient during the types of temperatures and heat indices that Mr. Ball, Mr. Code, and Mr. McGee are exposed to, that the highest recommended method of preventing heat-related illness is in fact exposure to air conditioning. Under this further public health guideline then, Your Honor, which is from the Environmental Protection Agency, which in turn cites to the Centers for Disease Control, these are all agencies and public health guidelines that now establish that in this particular situation with people who have medical conditions along the lines of Mr. Ball, Mr. Code, and Mr. McGee, that this is a recommended method of mitigating that risk. For medical conditions. Your Honor, this was a recommendation for all persons with additional, I would direct Your Honors to the trial exhibit, which is trial exhibit number 127, and in particular pages 49 to 52, which has some of those recommendations as well as the appendix in that publication, which provides the details of why they are recommending what they are recommending because of the fact that deaths occur even amongst free people who are not incarcerated for 23 hours per day in the state of Louisiana. Okay. Thank you. We have your argument. Thank you, Your Honor. Okay. Mr. Diod. Your Honors, just three brief points I'd like to bring up in my rebuttal. The first is, it's a quote that's directly taken from plaintiff's brief. The district court made specific factual findings that the relief in Gates was insufficient and that only by maintaining a maximum heat index of 88 degrees would the unconstitutional risk of harm to plaintiff's health be remedied. If that doesn't sound like asking this court to overrule its precedent in Gates, I don't know what does. Because that's essentially what is being asked by this court in this matter. No court to my knowledge has ever ordered a prison to keep the heat index at a specific temperature. To the extent the Gates court says, when the heat index gets to 90 degrees, you need to do this. Well, we've done those things. We've done those things in excess. And we do them all year round. We built this prison with the understanding that these guidelines were sufficient. A couple more points on What guidelines are you talking about? The guidelines set forth by the court in Gates. So, okay. So your architect was not the public health service. It was the federal court. My architect, and that's actually the third point I was going to bring up, but I'll talk about it now. Okay. There's nothing wrong with that building. The testimony clearly reflects that it meets all architectural standards. The plaintiffs rely on, it's called ASHRAE standards, but they're not binding in Louisiana. What is binding in Louisiana at the time our building was constructed was the Southern Building Code. And I believe now it's called the International Building Code. That is the information that was determined by the architects and engineers who have the knowledge and experience required and necessary to determine safeguards against heat-related illness and injury in the process of constructing buildings. That is what, that is the standard the defendants relied on, that the architect, that the people who construct the prison relied on when they built that building. There's nothing wrong with that building. There's nothing wrong with the ventilation in that building. So is your argument that the conditions, may I summarize it as I best understand it, A, death row at Angola does not violate the Eighth Amendment because it complies with Gates v. Cook, and B, to the extent that the district court ordered a remedy beyond Gates v. Cook, that is impermissible? That's absolutely correct, Your Honor. All right. Now, did you or the district court draw a distinction between the two possible ways to address this, which are, if it's too hot, you can either remediate the climate through fans and ventilation or even air conditioning, or you can remediate the people, right? Correct. And, okay. My understanding is the district court believes that given their medical conditions, it is important that we remediate the people that we provide. My point is, why couldn't you just move those three inmates to be next to the door to the administrative pod? Your Honor, to my knowledge, that was offered. I don't think this is in the record, though. I believe my co-counsel engaged in discussions with him about the possibility of putting these three guys in a separate area. Now, opposing counsel may contradict me, and he was privy to what went on, so he'll know better. Well, irrespective of what's in the record, though, the PLRA, which is the law of Congress that binds federal courts, says that you use the narrowest possible remedy, and I just wondered whether that, given the fact that these fellows are particularly vulnerable, whether that is something that the district court should have considered. Maybe you didn't bring it to his attention. To my knowledge, Your Honor, that was not the consideration. The consideration was the general population. What's good for these three inmates needs to be good for the other 88 prisoners, or the other 85 prisoners in this case. That's my general understanding. I have a few seconds left. Just real briefly, I'd like to, in response to Judge Elrod's concern about the ICE, I would like to point the court to some testimony from the prisoners. James McGee, one of the plaintiffs, acknowledged there's an ICE chest on every tier, and ICE is available to the prisoners. That's 5773. He also admitted during the night when the tiers are on lockdown, most of the time guards will provide prisoners with ICE when requested. That's 5759. Another one said he's never even asked a guard to give him ICE. Nathaniel Cote has never even asked a guard to give him ICE. That's 5629 and 5700. And finally, Nathaniel Cote also admitted he chooses not to utilize the ICE provided to him as a remedial measure. That's 5684. A lot of these guys will wet their shirts or towels and place it over their face, which Dr. Vasallo, in her testimony, said is a good remedial measure. Nathaniel Cote doesn't even do that. So, Your Honor, I'm out of time. I would just respectfully request this court find that Gates v. Cook is still viable, that my clients followed the standards set forth in Gates v. Cook, and that there was no Eighth Amendment violation. Thank you, Your Honor.